IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CYNTHIA M. SCHLATTER, now known as Cynthia Harmon,** )<br>)<br>) | |
| **Plaintiff,** )<br>) | |
| ) | **Civil No. 15-cv-485-CJP**[1] |
| vs. )<br>) | |
| **CAROLYN W. COLVIN,**<br>**Acting Commissioner of Social**<br>**Security,** )<br>)<br>)<br>) | |
| **Defendant.** | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Cynthia M. Schlatter seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in October 2011, alleging disability beginning on January 1, 2009. (Tr. 26). After holding an evidentiary hearing, ALJ Maryann S. Bright denied the application on August 21, 2013. (Tr. 26-35). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 6). Administrative remedies have been exhausted and a timely complaint was filed in this Court. (Tr. 1).

## Issues Raised by Plaintiff

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 10.

1

Plaintiff raises the following points:

1. The ALJ erred in determining that plaintiff did not meet or equal Listing 1.04.

2. The credibility determination was legally insufficient.

3. The RFC assessment was not supported by substantial evidence

## **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at

step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). See also, *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Schlatter was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not

4

abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Bright followed the five-step analytical framework described above. She determined that plaintiff had not engaged in substantial gainful employment since the alleged onset date, and that she was insured for DIB through June 30, 2010.[3] She found that plaintiff had severe impairments of history of lumbar lipoma status-post four resections, left lower extremity cellulitis, and idiopathic neuropathy. She further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level, with a number of physical and mental limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work. She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time

---

[3] The date last insured is relevant only to the claim for DIB, and not to the claim for SSI.

period.[4]

### 1. Earnings Records

Ms. Schlatter had no earnings from 2005 through 2007. She earned less than $600 per year in 2009 and 2010, and had no earnings from 2011 through 2013. (Tr. 181).

### 2. Agency Forms

Plaintiff was born in 1968, and was almost 41 years old on the alleged onset date. (Tr. 186). She alleged that she was unable to work because of a lipoma in the spine, numbness in her left leg, general weakness, broken right foot, poor circulation and acid reflux. She was 4'11" and weighed 135 pounds. (Tr. 190). She worked as a machine operator from the 1990's to 2004, and she was self-employed as a cleaner from January 2008 through August 2010. (Tr. 191).

### 3. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on June 28, 2013. (Tr. 49).

Ms. Schlatter had gotten married about a year before the hearing. She lived in Indiana when she applied for disability, but she had moved to Olney, Illinois, at the time of the hearing. She and her husband had no income and she had no health insurance. (Tr. 53-55).

Plaintiff testified that she could not work because she had back pain and foot pain. She stepped on barn staples two years prior and her left foot got infected.

---

[4] Plaintiff is not making any argument with regard to her right foot fracture or bladder dysfunction. See, Doc. 18, p. 1, n. 1.

She lost the feeling in that foot. She had surgery on a spinal lipoma in 2009. She did not return to the surgeon until 2012 because she did not have money or insurance. She had applied unsuccessfully for Medicaid. (Tr. 59-61).

She saw a doctor for her foot at a clinic for people without insurance. That doctor wanted her to see a specialist, which she could not afford. The infection had not healed. (Tr. 62). She was no longer seeing that doctor for her foot. (Tr. 65).

Plaintiff was taking Cymbalta, which helped calm the nerves in her spine. The Cymbalta is from a prescription that was written a few months ago. She was not seeing a doctor in Illinois, but she would have to see someone to get medication. She again said she had "no money, no income." (Tr. 65-66).

Ms. Schlatter testified that she had to shift positions often because of back pain. She also had tingling in her arms and hands because of "bad circulation." She sometimes had difficulty using her hands. She could not get comfortable while sitting. (Tr. 67-68).

Plaintiff did some things around the house. What she was able to do on any day depended on how much she had done the day before. She sometimes fell down because she lost her balance. She had difficulty sleeping and did not feel refreshed when she woke up. She was tired during the day and, if she had bad pain, she would stay in bed or sit in a lounge chair with her feet up. (Tr. 70-74).

Ms. Schlatter and her new husband moved to Illinois to be closer to his family. (Tr. 66).

Plaintiff's husband Tony Harmon testified that plaintiff had good days and

7

bad days, and she was often unable to finish what she started. She put in a garden at their new house in Illinois, but he had to help her up when she was finished. (Tr. 80-81). They were fixing the house up. They bought the house with "what [he] already had" and help from his mother. (Tr. 84).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the light exertional level, who required a sit/stand option provided she was not off-task for more than 10% of the work period, limited to frequent balancing, stooping, kneeling, crouching and crawling; occasional climbing of ramps and stairs; no climbing of ladders, ropes or scaffolding; no concentrated exposure to slick surfaces, hazardous machinery, or unprotected heights; and only simple, routine, repetitive unskilled tasks.

The VE testified that this person could not do plaintiff's past work. However, she could do other jobs in the national and regional economy. Examples of such jobs are inspector and hand packager, small products assembler, and production assembler. (Tr. 86-90).

4. **Medical Treatment**

In November 2008, Ms. Schlatter complained to primary care physician Dr. Mark Souder that she was experiencing low back swelling and pain. On exam, she had 1+ edema in the lower extremities and some pain and tenderness in the back. He recommended an MRI, and noted that she had no insurance and was "self pay." (Tr. 306).

An MRI of the lumbosacral spine done on January 6, 2009, showed multiple

findings, including some prominence of subcutaneous fat in the lower lumbosacral spine, possibly lipoma; fatty tumor along the conus medullaris, appearing to be within the thecal sac, moving posteriorly and creating an indentation on the posterior thecal sac, creating borderline central canal stenosis; conus medullaris tip at L3-4, suggesting some tethering of the cord associated with lipoma; and mild retrolisthesis of L2 on L3, with lipoma, causing central canal stenosis. (Tr. 319-320).

Plaintiff saw Dr. Tyler Koski at Northwestern Medical Faculty Foundation in Chicago, Illinois, on February 24, 2009. Dr. Koski, a neurosurgeon, saw plaintiff in conjunction with his fellow, Dr. Neal. Dr. Koski noted that Ms. Schlatter had a history of lipomyelomeningocele, status post three lipoma resections and untetherings.[5] The last surgery was about 25 years ago. She recently began having symptoms of pressure sensation in the back, numbness in her legs and difficulty with voiding. Physical exam showed tenderness to palpation over the lumbar region in the area of her scar. He reviewed her MRI, and noted that it showed a small lumbar lipoma with a probable tethered cord. Dr. Koski felt that "severe dynamics is indicated" and suggested that she be seen by his partner, Dr. Ganju, who had a clinical interest in tethered cord. (Tr. 223-224). Dr. Neal's note from the same visit indicates that plaintiff had decreased sensation to light touch, left greater than the right, in all dermatomes, L2 through S1. (Tr. 225).

Dr. Aruna Ganju, also a neurosurgeon at Northwestern, saw plaintiff on

---

[5] "Lipomyelomeningocele lies within the spectrum of closed neural tube defects. It represents a complex disorder that may present with neurological deficits secondary to the inherent tethered cord." http://www.medscape.com/viewarticle/772263_1, visited on June 22, 2016.

9

March 19, 2009. She agreed that the MRI showed evidence of intradural lipoma and low lying clonus. She ordered further testing. (Tr. 236).

An x-ray of the lumbar spine showed spina bifida at L3 through L5.[6] Evoked potentials testing showed absent P37 responses from the left tibial nerve, indicative of a lesion in the cord or above. (Tr. 250).

Dr. Ganju reviewed the results of the tests she ordered, and concluded that plaintiff had recurrent lipoma. She recommended surgery. (Tr. 261).

The hospital notes relating to the surgery are not in the transcript.

On May 29, 2009, Dr. Ganju noted that plaintiff was about four weeks post resection of recurrent lumbar lipoma and untethering of cord. Her wound was well healed. She was to continue on Keflex for another week. (Tr. 278). On June 22, 2009, plaintiff complained that her left back was "pinching and it feels like it's cutting off circulation to my leg." Dr. Ganju noted that plaintiff was "doing well" and ordered physical therapy. (Tr. 281-282).

Plaintiff was evaluated by a physical therapist in Auburn, Indiana, on July 29, 2009. She said that her left side, left hip, around her left buttocks and down to her foot were all "relatively numb." The therapist noted pain with palpation at T11 to S5. She had a full range of motion of the trunk and lower extremities. Trunk strength was 4/5. She had numbness to light touch on the left side. Her gait was antalgic. She was to be seen for therapy two times a week for six weeks. Plaintiff attended three visits. After she missed three visits, she was discontinued from

---

[6] "Spina bifida is a neural tube defect - a type of birth defect of the brain, spine, or spinal cord. It happens if the spinal column of the fetus doesn't close completely during the first month of pregnancy. This can damage the nerves and spinal cord." https://www.nlm.nih.gov /medlineplus /spinabifida.html, visited on June 22, 2016.

physical therapy.   (Tr. 362-366).

Ms. Schlatter did not return to Dr. Ganju until March 2012.   She told the doctor that she recently had left lower extremity numbness.   Motor testing indicated 5/5 strength.   X-rays and MRI showed evidence of low lying cord and some lipomatous tethering at the caudal end.   The impression was low lying cord.   Dr. Ganju indicated she would review the official MRI report and then do further treatment planning.   (Tr. 423).   Plaintiff evidently did not return to Dr. Ganju.

Ms. Schlatter also had an ongoing problem with her left foot.   In August 2011, she was seen at St. Martin's Healthcare for a possible infection and pain in her left foot.   She had stepped on some old wood and staples two months prior and had been seen in the emergency room.   She had been given antibiotics and her foot got better, but now it was getting worse.   She said that she had decreased sensation in her feet because of a childhood spinal tumor.   On exam, she had a tunneling wound on her left heel and no sensation to the plantar surface of the left foot.   She was given a tetanus shot and Keflex.   (Tr. 333).   On the next day, necrotic tissue was debrided and she was prescribed Doxycycline.   (Tr. 332).

She was seen periodically for wound care and debridement.   (Tr. 329-331).   In April 2012, her heel was "all healed" and she was to keep the callus filed down.   However in May the wound was draining a little, and by June 2012 she had developed a ½ cm. cavity below the callus.   In July 2012, the doctor noted a "deep hole" and again debrided the area.   (Tr. 445-447).   In August the hole was "about the same."   The doctor ordered an x-ray.   She was given an x-ray slip and financial need paperwork.   The x-ray showed skin defect or thickening involving the heel

and a very small plantar spur. (Tr. 440-441).

Ms. Schlatter was seen by Dr. Gage Caudell, a podiatrist at Fort Wayne Orthopedics, on September 19, 2012. Over the weekend, her left foot had become red and swollen, and she had chills and fever. On exam, he noted a partial thickness wound with granular base. Vascular was intact, but protective sensation was absent in the left foot. There was mild swelling and no purulence. She had mild pain along the tarsal tunnel. The assessment was ulcer of the left heel and idiopathic neuropathy. Dr. Caudell prescribed antibiotics and instructed her to be nonweightbearing on the left foot. He noted there was a high risk of losing the extremity. (Tr. 430-431).

In February 2013, the wound had "returned." Plaintiff was prescribed Keflex and issued crutches. She was to be nonweightbearing on her left foot. (Tr. 436).

Ms. Schlatter went to the emergency room on May 7, 2013, for problems with her left foot. On exam, there was no foot or ankle tenderness. She had callous formation on the bottom of the heel and lateral side of the foot, but no increased temperature or redness. (Tr. 449-449). An x-ray showed soft tissue thickening around the calcaneus (heel bone) and minimal degenerative changes. (Tr. 456). The impression was neuropathy, peripheral idiopathic. (Tr. 453).

5. **Consultative physical exam**

A state agency consultant examined plaintiff at the request of the agency in January 2012. She was on crutches and had a walking boot on her right foot due to a fracture. On exam, she had no sensation to the left foot or lower leg. Muscle

12

strength was 2/5 in the left lower extremity and 3/5 in the right lower extremity. Grip strength was 4/5 bilaterally. Cervical range of motion was limited, but lumbar range of motion was full. There was tenderness to palpation in the lumbosacral spine. The doctor noted that she had difficulty with left leg numbness and weakness and difficulty with ambulation and falling due to the lack of sensation. (Tr. 371-375).

## **Analysis**

Plaintiff first argues that the ALJ's analysis of whether she met or equaled Listing 1.04 was perfunctory and insufficient.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled. In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. §404.1525(d). The claimant bears the burden of proving that she meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

Plaintiff argues that the ALJ did not sufficiently consider whether she met the requirements of Listing 1.04, which are as follows:

> Disorders of the spine . . . resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
>
> With
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive

13

straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpt. P, App. 1, §1.04.

§1.00.K.4 states that tethered cord syndrome should be evaluated under Listing 1.04, and that the neurological effects of that condition should be evaluated under the criteria of Listing 11.00.

The ALJ said that plaintiff did not meet Listing 1.04 because "the record does not demonstrate" the requirements of the Listing. She also said that plaintiff's idiopathic neuropathy did not meet or equal Listing 11.00 "because the evidence fails to establish any neurological deficits." (Tr. 29).

The Court agrees that the ALJ's discussion of the Listings was impermissibly perfunctory. ALJ Bright's discussion was similar to the ALJ's discussion of the Listing in *Minnick v. Colvin*, 775 F.3d 929 (7th Cir. 2015). There, the ALJ's "analysis" consisted only of the statement that "The evidence does not establish the presence of" the Listing's requirements. The Seventh Circuit called this "the very type of perfunctory analysis we have repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing." *Minnick*, 775 F.3d at 935-936.

14

The Commissioner argues that the ALJ's analysis was not deficient because she discussed the medical evidence in other parts of her decision, and, in any event, any error was harmless because plaintiff does not meet or equal a Listing.

The Commissioner's position must be rejected because the ALJ failed to discuss medical evidence favorable to plaintiff's claim that she met or equaled Listing 1.04.  For example, the ALJ failed to note that Dr. Koski's fellow, Dr. Neal, noted in February 2009 that plaintiff had decreased sensation to light touch, left greater than the right, in all dermatomes, L2 through S1.  (Tr. 225).  After her surgery, the initial physical therapy note indicated that she had decreased trunk strength, as well as numbness and lack of pressure on her left side, swelling in her left ankle and an antalgic gait.  (Tr. 310-311).  The ALJ acknowledged that the March 2012 MRI showed a low lying cord (Tr. 31), but she failed to acknowledge that a radiology report from lumbar x-rays taken the same day stated that that plaintiff was "able to flex and extend only slightly."   (Tr. 424).  Further, according to Dr. Ganju, the MRI showed some lipomatous tethering at the caudal end as well as low lying cord.  (Tr. 423).  And, the ALJ was very selective in discussing the consultative medical exam, failing to note that the state agency consultant found on exam that plaintiff had no sensation to the left foot or lower leg and that muscle strength was 2/5 in the left lower extremity and 3/5 in the right lower extremity. The doctor also noted that plaintiff had difficulty with left leg numbness and weakness and difficulty with ambulation and falling due to the lack of sensation. (Tr. 371-375).

The ALJ in *Minnick* also failed to discuss relevant medical evidence.  "We

15

cannot discern from the ALJ's scant analysis whether she considered and dismissed, or completely failed to consider, this pertinent evidence. If the ALJ did consider and dismiss some or all of this evidence, she never so stated." The Seventh Circuit held that the ALJ failed to build the required "logical bridge" from the evidence to her conclusion.  *Minnick*, 775 F.3d at 936.

This is not to say that the ALJ was required on this record to find that plaintiff meets the requirements of Listing 1.04.  However, there is relevant evidence that was not discussed by the ALJ in this context.  While the Court acknowledges that the ALJ's decision must be read as a whole, the failure to explain why this relevant evidence did not establish that plaintiff met Listing 1.04 leaves the Court unable to review the ALJ's decision in this regard.  "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  See also, *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) ("[A] a denial of benefits cannot be sustained where an ALJ failed to articulate the bases of his assessment of a claimant's impairment.")

The Court also agrees that the ALJ's credibility analysis was erroneous.  Ms. Schlatter testified that she had no income and no health insurance, that she sought treatment for her left foot at a clinic for people with no insurance and was unable to afford to see a specialist, and that she delayed returning to Dr. Ganju until 2012 and had not seen a doctor in Illinois because she had no money.  (Tr. 55, 61, 62, 66).  The St. Martin's Healthcare records reflect that plaintiff was given "financial

16

need paperwork" in August 2012, indicating that the staff was aware of her inability to afford medical treatment. (Tr. 440). The ALJ said that plaintiff's testimony that she could not afford treatment was "given deference," but she also said that she "took into consideration the contradictory testimony that the claimant and her husband just purchased a home and own the deed to their home and are remodeling their home." (Tr. 32).

An ALJ may not conclude that a claimant is exaggerating her limitations based on lack of medical treatment or failure to take medication without taking into account the claimant's inability to afford treatment. *Garcia v. Colvin*, 741 F.3d 758, 761-762 (7th Cir. 2013), citing SSR 96-7p, 1996 WL 374186, at *7-8. "Inability to pay for medication . . . may excuse failure to pursue treatment." *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).

Here, ALJ Bright's characterization that the testimony that plaintiff and her husband bought a house was "contradictory" suggests that she did not believe plaintiff's testimony that she did not seek treatment because of her finances. This conclusion is not supported by the record. First, the ALJ ignored Mr. Harmon's testimony that they bought the house with "what [he] already had" and help from his mother. (Tr. 84). There was no evidence of the cost of the house or of how much his mother paid. More importantly, plaintiff did not marry Mr. Harmon until sometime in the year before the hearing. Ms. Schlatter testified that she had been married for "almost a year." (Tr. 53). Mr. Harmon testified that they got married on October 1. (Tr. 78). The hearing took place on June 28, 2013. (Tr. 47). The fact that plaintiff and her husband bought a house after they got married with

17

his money and with help from his mother in no way contradicts plaintiff's testimony that she was unable to afford treatment, particularly since the marriage took place years after the alleged date of disability.

Because of the ALJ's errors, this case must be remanded. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Schlatter was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff, Cynthia M. Schlatter, now known as Cynthia Harmon.

**IT IS SO ORDERED.**

**DATE:   June 28, 2016.**

>   s/ Clifford J. Proud
>   **CLIFFORD J. PROUD**
>   **UNITED STATES MAGISTRATE JUDGE**